I fully concur in the opinion of Mr. Justice STRAUP. A proceeding for the determination of whether or not property is subject to the payment of an inheritance tax is in the nature of a suit in equity, and therefore this court, under our state Constitution, article 8, § 9, upon an appeal involving questions of both law and facts, must consider and determine both of such questions.
In this case, if the property here sought to be held liable for the payment of an inheritance tax is so held liable, it must be either because the transferring of the property in question as intended to, and did, take effect in possession and enjoyment at or after the death of Ezra Thompson, or that Thompson transferred the property to his children in contemplation of death.
At the trial of this case, the state called as its witnesses all of the heirs at law of Ezra Thompson, deceased. Practically all of the evidence relied upon by the state to support its contention is the testimony of such heirs. Each of the heirs testified that the certificates of stock involved in this proceeding were delivered to the various owners soon after the stock certificates were made out, and that each heir and donee had the absolute control of the stock transferred from and after the date of such transfer. The books and records of the various corporations show that the heirs at law were the owners and holders of the record title to the stock certificates from and after the transfer, except such stocks as were sold by some of the donees. When dividends were declared upon the stock, such dividends were paid to, and received by, the various children of Ezra Thompson, as shown by the books of the corporation. The testimony of E.A. Culbertson and W.W. Murdock, both disinterested witnesses, is to the effect that, about the time *Page 66 
Ezra Thompson transferred the shares of stock in the Thompson-Murdock Company and the Ezra Thompson Investment Company, Ezra Thompson stated that he had conveyed the stocks in these companies to his children. All of the direct evidence without conflict, shows that there was an absolute, unrestricted gift and transfer of the stocks by Ezra Thompson to his children, with the intention that title and possession should vest in the children in praesenti, and not at some future time. The state must succeed, if it succeeds at all, in its contention that the property in question was transferred by Ezra Thompson to take effect at or after the death of Ezra Thompson solely upon inferences.
It is contended on behalf of the state that some of the evidence appearing in the record is inconsistent with the direct evidence that the transfers of the stocks to the children were absolute and to take effect in praesenti. It is thus contended that the fact that the children loaned to their father part of the dividends received from the stocks given to them is evidence that the father did not make an absolute gift. The most that can be said in favor of such contention is that it creates a vague suspicion. It is not inconsistent with an absolute gift. It is only natural, and indeed rather to be expected, that the children, after receiving substantial gifts from their father, should be entirely willing to loan, or, if need be, give to their father, part of the dividends received from the stocks given to them by the father. To do otherwise would be ungrateful in the extreme.
It is also urged that it is quite improbable that Ezra Thompson and his wife would make an absolute gift of so much property to their children. The evidence shows that Ezra Thompson retained stock in the Cardiff Mining Company of the value of $165,000, as found by the trial court, and other property not mentioned in the trial court's findings of a value estimated at $60,000 to $85,000. Certainly with this property, coupled with the business ability shown to have been possessed by Ezra Thompson, neither he nor his wife had any cause to anticipate that they would *Page 67 
not be amply provided for after the gifts had been made to the children. It is by no means unnatural that Ezra Thompson and his wife should find more pleasure in assisting their children by giving them substantial gifts of property while the father lived and was able to help and guide the children in the control and use of such property rather than to hoard the same. Neither do I see any controlling significance in the fact that some of the children were not familiar with the details of the corporations in which they were stockholders and officers, nor in the fact that the father continued to take the lead in conducting the business of the corporation until he was stricken with the sickness which resulted in death. It is probably the rule, rather than the exception, that stockholders of corporations are not familiar with the business of the corporation in which they own stock. It is not at all uncommon for officers of corporations to be ignorant of the details of the business of their corporation, especially where such officers, as here, had implicit confidence in those who were actively engaged in conducting the corporation's business.
It is a well-established rule of law that the trier of the facts, whether it be judge or jury, must reconcile the evidence so far as may be, but, when there is a conflict in the evidence, such trier of the facts must determine wherein lies the ultimate truth. In this cause there is no conflict in the direct evidence, and any inferences that may be properly drawn from the proven facts are by no means necessarily inconsistent with the direct evidence. As I view the evidence in this case, only one conclusion is permissible, and that is, Ezra Thompson made absolute gifts, in praesenti, of the property involved in this proceeding, and to hold that such gifts were not to take effect until at or after his death is to find, as a fact, that which is not supported by any substantial evidence, and is against all of the uncontradicted direct evidence in the case.
I am likewise of the opinion that the state must fail in its contention that the evidence in this case supports a finding *Page 68 
that the gifts of the stocks by Ezra Thompson to his children were made in contemplation of death. It seems that this court is committed to the views expressed herein by Mr. Justice STRAUP as to what is meant by the words "in contemplation of death."
In re Romney's Estate, reported in 60 Utah, 173, 207 P. 139, the same questions were before this court that are involved in this proceeding. A better understanding of the full purport of this court's views in the Romney Estate Case, supra, will probably be had by a brief detailed statemen of the facts forming the basis of that decision as shown by the decision and the record on file in this court in that proceeding.
The state treasurer of Utah filed a petition to subject the property of George Romney Sons Company to the payment of an inheritance tax. The petition set out that George Romney had, during his lifetime, transferred to his children stock in the George Romney Sons Company of the value of $500,000, and that the transfer of such stock was made in contemplation of death and with the intention that the transfer should not take effect in possession or enjoyment until at or after the death of George Romney. The facts in the Romney Estate Case are these. On May 14, 1903, George Romney and ten of his sons organized a corporation under the laws of the state of Utah with an authorized capital stock of $200,000 divided into 2,000 shares of the par value of $100 each. The name of the corporation was George Romney Sons Company. George Romney subscribed for 1,990 shares and each of his sons for one share in the corporation. All of the property conveyed to the corporation in payment of the shares of capital stock was the property of George Romney. Immediately upon the organization of the company, George Romney transferred 1,982 of the 1,990 shares owned by him to his sons and daughters, 24 in number, giving 82 shares to each son and 83 shares to each daughter. As each son received one *Page 69 
share at the time of the incorporation, the number of shares given by George Romney to each of his children was the same, namely, 83 shares, George Romney retaining 8 shares in the corporation. The children gave no consideration for the stock received by them. It will be noted in the opinion in Re Romney'sEstate Case, supra, that George Romney was 86 years of age when he attended a directors' meeting in either December, 1917, or January, 1918. He was thus either 71 or 72 years of age, when, in May, 1903, he organized the George Romney Sons Company. George Romney was made president of the corporation by the articles of incorporation, and continued as such until the date of his death, February 1, 1920. As president of the corporation, George Romney received no fixed salary, but was permitted to take as salary, and did take as salary, such money as he deemed just and proper, the amount of which is not shown. No books were kept of the receipts and disbursements of the corporation, except such amounts as were received by the children of George Romney from the assets of the corporation. George Romney, soon after the incorporation of the company, by resolution of the board of directors, was granted full power in the name of the corporation to mortgage, sell, convey, and lease any and all property of the corporation, with full power to convey the same, and also power to buy in the name of the corporation real estate, mortgages, bonds, leases, all evidences of indebtedness and personal property of every kind and nature which in his judgment was necessary for the benefit of the corporation, and likewise was granted power to receive and pay out the moneys from whatsoever source the same was received. The record in the Romney Estate Case does not show the value of the property retained by George Romney at the time he transferred the stock of George Romney 
Sons Company to his children, but the trial court found that at that time he had in his possession and under his control a substantial separate estate and property rights from which he received a substantial annual income. In *Page 70 
the probate proceedings of the estate of George Romney, the property which it was conceded belonged to his estate was appraised at the value of $46,702.53. In the Romney Estate Case the state contended that the deceased, at the time of his death, was the owner of property in addition to that appraised at $46,702.53, while the respondents contended that the additional property, which consisted of shares of stock in various corporations, belonged to George Romney Sons Company. This court held that this additional property was never conveyed to George Romney Sons Company, but was the property of George Romney at the time of his death, and therefore subject to the payment of an inheritance tax. Upon the issue involving the stock in the George Romney Sons Company the trial court found:
"George Romney, at the time of the incorporating of the George Romney Sons Company, and for many years prior thereto and thereafter, was physically and mentally in good health, and actively engaged in business in Salt Lake City; and the property transferred by him to the George Romney Sons Company was not transferred in contemplation of death."
In reviewing the trial court's findings above quoted, this court used this significant language:
"In our judgment there is no evidence in the record to support the claim that at the time George Romney organized the respondent corporation [George Romney Sons Company] in 1903 and conveyed to it certain real property and afterwards gave to his several children practically all of the capital stock of that company he did so in contemplation of death. On the contrary, the evidence is undisputed that at that time Mr. Romney was in good health and actively engaged in business. He continued to look after the business of the company for many years. The title to the real property so conveyed remained continuously in the name of the corporation, and the control and management of the same was under its direction."
A comparison of the facts in the George Romney Estate Case with the facts in the instant case reveal many striking similarities. Thus George Romney was 71 or 72 years of age when he transferred to his children, by gift, practically *Page 71 
all of the stock in the George Romney Sons Company. Ezra Thompson was 66 years of age when he transferred the stock involved in this proceeding to his children. Both Romney and Thompson were in good health and actively engaged in business at the time of the transfer, and continued to engage in business for a number of years thereafter, Romney for over 16 years and Thompson for more than 6 years. Romney retained a substantial separate estate. Thompson retained between $225,000 and $250,000. George Romney transferred to his children by way of gift in equal shares practically all of the stock of the George Romney Sons Company, a corporation with an authorized capital stock of $200,000. Ezra Thompson transferred to his children by way of gift in equal shares practically all of the stock owned by him in the Thompson-Murdock Company, a corporation with an authorized capital stock of $100,000, and also in the Ezra Thompson Investment Company, a corporation with an authorized capital stock of $100,000. At various times subsequent to the incorporation of the George Romney Sons Company in 1903, and prior to the death of George Romney, he transferred to his children by way of gift between 5,000 and 6,000 shares of stock in various corporations, namely, Z.C.M.I., Home Fire Insurance Company, Utah-Idaho Sugar Company, and the Amalgamated Sugar Company, the value of which stock is not shown by the record in the George Romney Estate Case, supra. Ezra Thompson in March, 1917, transferred to his children by way of gift 150,000 shares of the capital stock of the Cardiff Mining Milling Company which the trial court found to be of the value of $750,000. Romney continued in the active management of the corporation in which he had given stock to his children, and in such management exercised practically all of the corporate powers. Thompson continued in the active management of the corporation in which he gave stock to his children, subject, however, to the action of the board of directors. Romney received as compensation for his services whatever he *Page 72 
thought proper. Thompson received as compensation for his services a fixed salary.
The Inheritance Tax Law of this state was so far as material here the same when Romney died as it was when Thompson died. When George Romney organized the George Romney Sons Company, a corporation, and transferred the stock therein to his children, the words "in contemplation of the death" were not a part of our Inheritance Tax Law. When Ezra Thompson organized the Ezra Thompson Investment Company and transferred the stock involved in this proceeding to his children, the words "in contemplation of the death" were a part of our Inheritance Tax Law. The opinion of this court in the Romney Estate Case does not discuss the question of whether the inheritance tax attaches under the law as it was at the date of the transfer or as it was at the date of the death of the donor. This court bases its conclusion upon the facts as found by the trial court and affirmed by this court that George Romney did not organize the George Romney Sons Company and give practically all of its capital stock to his children in contemplation of death.
I can see no escape from the conclusion that, if the stock transferred by George Romney to his children was not made in contemplation of death, likewise, and for the same reasons the stock transferred by Ezra Thompson to his children should not and cannot properly be held to have been made in contemplation of death. Certain it is that courts should adhere to a uniform construction of legislative enactments otherwise favoritism is shown by the courts where citizens have a recognized right to demand and receive even-handed treatment.
The Romney Estate Case was decided in 1922, and since then we have had three sessions of the state Legislature, and no change has been made in our law as it affects inheritance taxes. It may well be assumed that the results reached by this court in the Romney Estate Case met with the approval of the legislative branch of our government or the law would *Page 73 
have been changed to meet the legislative intent or desire. If a change in our Inheritance Tax Law is desirable, it should come from the Legislature and not from the courts.